# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 23, 2021      Decided February 4, 2022

No. 19-7162

WYE OAK TECHNOLOGY, INC.,
APPELLEE

v.

REPUBLIC OF IRAQ AND MINISTRY OF DEFENSE OF THE
REPUBLIC OF IRAQ,
APPELLANTS

———

Consolidated with 19-7169

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01182)

———

*Boaz S. Morag* argued the cause for appellants/cross appellees. With him on the briefs were *Andrew A. Bernstein* and *Timothy B. Mills.*

*Neal Kumar Katyal* argued the cause for appellee/cross-appellant. With him on the briefs were *C. Allen Foster, Eric C. Rowe, John H. Quinn, Jr., Patrick M. Klemz, Mitchell P. Reich, Reedy C. Swanson,* and *Sundeep Iyer.*

Before: HENDERSON and JACKSON, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* JACKSON.

JACKSON, *Circuit Judge*:  This appeal arises from a fully litigated contract dispute between an American defense contractor and a foreign government that resulted in a multimillion-dollar plaintiff's judgment.  Wye Oak Technology, Inc. first filed its complaint against the Republic of Iraq in the U.S. District Court for the Eastern District of Virginia ("EDVA").  Finding improper venue, that court transferred the case to the U.S. District Court for the District of Columbia ("DDC"), but not before flatly denying Iraq's motion to dismiss the complaint on sovereign immunity grounds.  And when the DDC eventually entered judgment in Wye Oak's favor nearly a decade later, after an eight-day bench trial, it did so partly in reliance on an intervening ruling from the Fourth Circuit, which rejected Iraq's contention that none of the exceptions to sovereign immunity in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., applied to Wye Oak's breach of contract claims.

To be specific, the Fourth Circuit held that because Wye Oak alleged that it had engaged in various acts inside the United States pursuant to the parties' agreement, the lawsuit could proceed under the second clause of the FSIA's commercial activities exception.  *See* 28 U.S.C. § 1605(a)(2) (abrogating foreign sovereign immunity with respect to claims that are "based upon . . . an act performed in the United States in connection with commercial activity of the foreign state elsewhere").  Thus, we are now called upon to decide whether we agree with our sister circuit's FSIA interpretation (as applied in the context of the post-trial judgment in Wye Oak's

favor that the DDC has entered against Iraq). We must also determine, incidentally, whether the law of the case doctrine somehow constrains our own assessment of Iraq's alleged immunity at this stage of the case.

In the opinion that follows, we first reject Wye Oak's argument that Iraq's participation in the DDC bench trial implicitly waived its sovereign immunity for the purpose of the FSIA's waiver exception. We then explain that the law of the case doctrine does not require us to adhere to the Fourth Circuit's conclusions about the applicability of the FSIA's commercial activities exception, and, indeed, unlike the Fourth Circuit, we conclude that the second clause of 28 U.S.C. § 1605(a)(2) does not apply to the established facts of this case. But we do discern a plausible basis for sustaining the district court's jurisdictional ruling in the language of the commercial activity exception's *third* clause. *See* 28 U.S.C. § 1605(a)(2) (abrogating immunity if the action is "based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States"). And we find that the district court is best positioned to evaluate (or develop) the record as necessary to determine, in the first instance, whether the facts support application of *that* provision of the FSIA.

Therefore, the district court's post-trial judgment is vacated to the extent that it is premised on a finding of subject-matter jurisdiction that rests on an erroneous interpretation of the second clause of the commercial activities exception, and this matter is remanded to the district court for a determination of whether Iraq's breach of contract caused "direct effects" in the United States for the purpose of the third clause of 28 U.S.C. § 1605(a)(2).

**I**

The FSIA, 28 U.S.C. § 1602, *et seq.*, affords the "sole basis for obtaining jurisdiction over a foreign state" in United States courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see also Samantar v. Yousuf*, 560 U.S. 305, 314 (2010). That statute "bars federal and state courts from exercising jurisdiction when a foreign state is entitled to immunity, and . . . confers jurisdiction on district courts to hear suits . . . when a foreign state is not entitled to immunity." *Diag Hum., S.E.*, *v. Czech Republic-Ministry of Health*, 824 F.3d 131, 134 (D.C. Cir. 2016).

The FSIA establishes the general rule for granting foreign sovereign immunity, 28 U.S.C. § 1604, and it also makes that grant of immunity subject to nine exceptions, *see id.* §§ 1605–1607; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015). The FSIA exceptions are exhaustive; if none applies to the circumstances presented in a case, the foreign state has immunity and the court lacks subject-matter jurisdiction. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014).

The two FSIA exceptions that are relevant to this appeal—waiver and commercial activity—appear at 28 U.S.C. § 1605(a)(1) and (2). In its entirety, that section of the statute provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> > (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect

except in accordance with the terms of the waiver;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Section 1605(a)(1) recognizes two species of waiver. Where "explicit[]" waiver occurs, the foreign state expressly consents to forgo its sovereign immunity with respect to a certain class of disputes or a particular subject matter. *See World Wide Mins., Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002). Generally speaking, because explicit waivers of sovereign immunity are narrowly construed "in favor of the sovereign" and are not enlarged "beyond what the language requires[,]" *id*. (quoting *Library of Cong. v. Shaw*, 478 U.S. 310, 318 (1986)), a foreign state "will not be found to have [explicitly] waived its immunity unless it has clearly and unambiguously done so[,]" *id.*

The waiver provision that is most relevant here is the FSIA's reference to "implicit[]" waivers of sovereign immunity, which the statute "does not define." *Creighton Ltd. v. Gov't of the State of Qatar,* 181 F.3d 118, 122 (D.C. Cir. 1999). However, this circuit has "followed the 'virtually unanimous' precedents construing the implied waiver provision narrowly." *Id.* (internal citations omitted). Thus, we have long held that "implicit in § 1605(a)(1) is the requirement

that the foreign state have *intended* to waive its sovereign immunity." *Id.* (emphasis added). The legislative history of the FSIA provides only three examples of implicit waivers by a foreign state, H.R. Rep. No. 94-1487, at 18 (1976), and courts have been reluctant to recognize an implicit waiver of sovereign immunity in other circumstances. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990) (explaining that an implied waiver occurs if the foreign state agrees to arbitration, agrees that the law of a particular country governs a contract, or has filed a responsive pleading without raising the defense of sovereign immunity).

Under Section 1605(a)(2), a foreign state's sovereign immunity is subject to abrogation based on the state's commercial activities. This statutory exception codifies the "restrictive theory" of sovereign immunity that the United States Department of State first endorsed in 1952, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992), pursuant to which foreign states were not afforded immunity in cases "arising out of purely commercial transactions[,]" *id*. at 613 (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 703 (1976)). The Supreme Court had long held that when "a foreign government acts, not as regulator of a market, but in the manner of a private player within it," *id*. at 614, its private acts might be sufficient to justify the invocation of the jurisdiction of American courts, *see id.* (distinguishing acts of the state as a market participant from undertakings aimed at "fulfilling its uniquely sovereign objectives"); *see also Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199 (2007). Thus, the FSIA's commercial activities exception carves out, and exempts from sovereign immunity, a sphere of private commercial action that foreign states sometimes undertake.

Notably, as Congress has worded it, the commercial activities exception is also designed to ensure that there is a sufficient connection between the foreign state's commercial activity and the United States to warrant the exercise of jurisdiction. *See Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 766 (2019). Thus, the first clause of section 1605(a)(2) requires a plaintiff's claim to be "based upon" an aspect of the foreign state's commercial activity that has a "substantial contact with the United States." *Odhiambo*, 764 F.3d at 36; *see also Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1513 (D.C. Cir. 1988) (clarifying that the degree of contact required must be more than isolated or transitory, and a plaintiff's mere citizenship status or place of residence will not suffice). The second clause of the commercial activities exception permits a suit against a foreign state when the plaintiff's claim is based "upon an act performed in the United States[,]" and that act is taken "in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2). And the third clause of the exception permits a suit against a foreign state if the claim is based upon an act outside the United States that is related to the foreign state's commercial activity if that act "causes a direct effect in the United States." *Id.*

## II

### A

After the fall of Saddam Hussein at the conclusion of the United States-led military action in Iraq, the newly constituted transitional government of Iraq sought to rebuild that country's armed forces. To this end and at the recommendation of the United States government, the Iraqi Ministry of Defense ("MoD") engaged the services of Wye Oak, a private defense contractor headquartered in Pennsylvania that specializes in foreign military equipment. As part of this engagement, Wye

Oak committed to inventorying and assessing Iraq's existing military equipment; refurbishing any such equipment to the extent possible; and arranging for scrap sales of any equipment that was not salvageable.

MoD and Wye Oak entered into a written Broker Services Agreement ("BSA") in August of 2004. Under the express terms of the BSA, Wye Oak was to serve as the sole and exclusive broker for these equipment recovery and refurbishment services for a one-year period. As compensation for this work, Wye Oak was to receive a 10% commission for scrap sales and 10% of the profit for any refurbishing services.

To receive its compensation, Wye Oak was required to provide the MoD with pro forma invoices detailing the work that had been done. The BSA specifically provided that "[a]ll payments to be made to [Wye Oak] under this Agreement shall be made in United States Dollars in the form and manner as directed by [Wye Oak]." Joint App'x 775.

Wye Oak began performing under the BSA in August of 2004. Wye Oak's CEO, Dale Stoffel, and other Wye Oak staff who were present in Iraq immediately began identifying, assessing, and refurbishing military equipment on the ground in that country. Meanwhile, David Stoffel—Dale's brother and the head of Wye Oak's information technology department, which was located in the United States—began to oversee all I.T. services for Wye Oak. These services included purchasing computer equipment and software and reviewing all email communications that came through the server that housed Wye Oak's data.

In October of 2004, Wye Oak submitted three pro forma invoices to the MoD, totaling $24,714,697.15. Each invoice specifically instructed the MoD to remit its payment to Wye

Oak "at the Baghdad Iraq office of [the MoD]." Joint App'x 781–83. There is no dispute that the MoD never paid these invoices.

Nor is it disputed that Wye Oak made many concerted efforts to collect the fee. For example, in the two months between Wye Oak's October submission of the invoices and December 8, 2004—when Dale Stoffel was tragically slain in Baghdad on his way to organize the release of funding—Wye Oak representatives met with American and Iraqi officials at least twice to discuss the project's progress and to address the still-outstanding invoices. As relevant here, these in-person meetings took place at MoD's headquarters in Baghdad. Wye Oak reported on the status of the project and also expressed its concerns about Iraq's failure to pay the invoices, including the specific worry that the lack of funding could interfere with Wye Oak's ability to execute subcontracts, such as an anticipated construction services agreement with Wye Oak's sister company, CLI Corporation, an American construction firm headquartered in Pennsylvania. During the meetings, Wye Oak managed to secure additional payment promises from Iraq.

Wye Oak also undertook various diplomatic efforts to secure the overdue funding. Its representatives reached out to American government officials (such as then-Secretary of Defense Donald Rumsfeld) to discuss the non-payment dilemma. And Wye Oak contacted General Investment Group, s.a.l. ("GIG"), a Lebanese company run by financier Raymond Zayna, which had entered into separate funding agreements with Wye Oak and Iraq related to the military equipment-recovery project. GIG had agreed to provide some financing for the project, and in its post-invoice conversations with GIG, Wye Oak stressed the necessity of payment of the invoices, and implored GIG to authorize that such payments be made to Wye Oak's bank account in Pennsylvania.

Despite these overtures, Wye Oak's invoices remained overdue when Dale Stoffel died on December 8, 2004. In the wake of that tragedy, the company withdrew all of its U.S. personnel from Iraq. It subsequently relied on local contractors with respect to its performance under the BSA, which included coordinating the production of operational armored vehicles for Iraq's January 2005 parliamentary election. Wye Oak ceased all operations in Iraq shortly after the January 2005 election, due to the lack of funding.

**B**

**1**

Wye Oak filed a complaint against Iraq in the EDVA on July 20, 2009, claiming that Iraq breached the BSA by refusing to pay the generated invoices. *Wye Oak Tech., Inc. v. Republic of Iraq*, No. 09CV793, 2010 WL 2613323, at \*1 (E.D. Va. June 29, 2010). Iraq responded with a motion to dismiss Wye Oak's complaint, contending primarily that, as a sovereign nation, it is entirely immune from suit under the FSIA. *See* Joint App'x 72 ("As a matter of law . . . the [c]ourt lacks subject matter jurisdiction because no exception to Defendant's sovereign immunity applies under the Foreign Sovereign Immunities Act.").

On June 29, 2010, the EDVA issued a lengthy opinion that, among other things, examined each of the three clauses of the FSIA's commercial activities exception to assess Iraq's sovereign immunity contention. The court evaluated "the factual allegations of the complaint and referenced writings" with respect to each clause, *Wye Oak Tech.*, 2010 WL 2613323 at \*7, and concluded, for each, that "Wye Oak has sufficiently established at this stage that this exception to the FSIA's sovereign immunity applies" such that "the [c]ourt may exercise subject matter jurisdiction over Iraq in this case[,]" *id.*

at *8. The EDVA further held that venue was not proper because a "substantial part of the events or omissions giving rise to Wye Oak's claim" did not occur in the Eastern District of Virginia. *Id.* at *11 (finding as much based on Wye Oak's allegations). Therefore, in addition to ruling on Iraq's motion to dismiss, that court also transferred the case "forthwith" to the federal district court in the District of Columbia. *Id.*

Iraq could not appeal the part of the EDVA's order that affected the transfer. *Ukiah Adventist Hosp. v. F.T.C.*, 981 F.2d 543, 546 (D.C. Cir. 1992). But it did appeal that court's concomitant rejection of its sovereign immunity argument. *See Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 206 (4th Cir. 2011).

On appeal, the Fourth Circuit began its consideration of Iraq's sovereign immunity argument with a discussion of the threshold question of whether it even had jurisdiction to entertain an appeal from the transferred case. *Id.* at 210. The panel majority acknowledged that it was not appropriate for the EDVA to have ruled on the merits of Iraq's motion to dismiss once it had determined that venue was improper. *Id.* at 209. However, over a vigorous dissent, the majority held that appellate jurisdiction could be invoked nonetheless, because the EDVA's sovereign immunity holding was an "immediately appealable" order, and that particular decision was thus "effectively severed from the balance of the case," in accordance with circuit authority. *Id.* at 209–10 (quoting *Technosteel, LLC v. Beers Constr. Co.*, 271 F.3d 151, 159–60 (4th Cir. 2001)).

With respect to the merits of the sovereign immunity question, the majority affirmed the EDVA's ruling based on the complaint's allegations of fact. The panel concluded that Iraq was engaged in commercial activity under the contract

12

with Wye Oak. *Id*. at 216–17. And it homed in on various acts that Wye Oak had allegedly undertaken inside the United States in connection with the BSA, including its alleged creation of computer programming software, contacts with agents of foreign nations, and provision of accounting services. *Id*. at 216. According to the panel majority, if true, these domestic acts meant that "Wye Oak made a sufficient showing that its breach of contract claim [was] based upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere" under the second clause of the FSIA. *Id*. Therefore, the panel held that section 1605(a)(2) of the FSIA authorized Wye Oak to litigate its claims against Iraq in federal court. *Id*. at 217.

The dissenting judge rejected the conclusion that appellate review was available in this circumstance based on the circuit's precedents. *Id*. at 218 (Shedd, J., dissenting). And he further maintained that the panel should forgo ruling on the sovereign immunity issue once the transfer had occurred, because, in his view, if the D.C. Circuit disagreed with the Fourth Circuit's immunity holding it "would create a circuit split in the *same* case[,]" which the law of the case doctrine could not fix. *Id*. 219 (describing the "tenuous situation" that would arise "if the courts in the District of Columbia were to find that subject matter jurisdiction does not exist").

**2**

Meanwhile, after the transferred case arrived in the DDC, on December 17, 2010, the court stayed its proceedings at the parties' request, in light of the pending Fourth Circuit appeal. The DDC lifted its stay approximately 18 months later, once the Fourth Circuit had ruled. The parties then engaged in pre-trial proceedings until August of 2019, when an eight-day bench trial commenced.

At the conclusion of the bench trial, the trial judge ordered the parties to submit Proposed Findings of Fact and Conclusions of Law; notably, the briefing that ensued was the first time that either party asked the DDC to address the sovereign immunity issue. Wye Oak filed the first brief, and it suggested therein that the district court should hold expressly that Iraq did not have sovereign immunity under the second or third clauses of the commercial activity exception. Iraq's proposed findings and conclusions eschewed any analysis of these purported statutory bases for abrogating its sovereign immunity. Instead, Iraq's brief merely maintained that "[p]laintiff bears the burden of proving at trial the existence of sufficient facts to establish that the Court possesse[d] [subject-matter] jurisdiction" and the court "shall determine its jurisdiction accordingly." Joint App'x 505.

On August 27, 2019, the DDC issued findings of fact and conclusions of law in support of its post-trial judgment. *See Wye Oak Tech., Inc. v. Republic of Iraq*, No. 10-CV-01182, 2019 WL 4044046 (D.D.C. Aug. 27, 2019). The district court specifically held that it had subject-matter jurisdiction "under clause two of the [FSIA's] commercial activity exception[,]" *id.* at *22, acknowledging first that the Fourth Circuit had held as much, and reasoning that the Fourth Circuit's opinion was "law of the case[,]" *id.* at *23. The district court further found that "the Fourth Circuit's immunity determination was substantively correct[,]" *id.*, because the evidence at trial established that Wye Oak had, in fact, engaged in various acts in the United States in connection with the BSA, such as managing the company's "electronic communications[,]" and "writing a computer program that could ultimately be used to inventory and track all the equipment Wye Oak was refurbishing[,]" *id.* at *24. Based on these acts, the DDC concluded that "Wye Oak's [breach of contract] action" was based upon "an act performed in the United States in

connection with a commercial activity of the foreign state elsewhere" within the meaning of clause two of the commercial activities exception. *Id.*

The district court further concluded that the evidence presented at trial established that Iraq had materially breached the BSA. *Id.* at *27. As a remedy, the court awarded Wye Oak approximately $88.9 million in compensation, including approximately $20.5 million for damages actually incurred plus $68.4 million for lost profits and prejudgment interest. *Id.* at *54. The district court also specifically rejected Wye Oak's argument that it was entitled to "complementary damages" under Iraqi law, because, in the court's view, complementary damages were similar to punitive damages, which the FSIA forecloses. *Id.* at 52.

## C

Iraq and Wye Oak now cross-appeal from the district court's post-trial judgment. As relevant here, Iraq argues that the district court erred in concluding that the second clause of the commercial activities exception applies, and that it was therefore entitled to invoke immunity under the FSIA. Appellants' Br. 18, 24. Wye Oak insists that the district court properly exercised jurisdiction over its claims under the FSIA for several independent reasons. It argues that Iraq "waived any immunity defense under 28 U.S.C. § 1605(a)(1) by failing to preserve or press that defense at trial." Appellee's Br. 15. It also contends that the Fourth Circuit's jurisdictional ruling "is law of the case," *id*. at 20, and that, regardless, its claims satisfy both the second and third clauses of the FSIA's commercial activities exception, *id*. at 25, 30.

This cross-appeal relates additionally to both parties' objections to various aspects of the district court's damages calculation. *See, e.g.,* Appellants' Br. 16–17 (arguing that the

district court erred by awarding Wye Oak certain damages, including costs Wye Oak did not incur, speculative lost profits, and prejudgment interest on the lost profit award); Appellee's Br. 17 (challenging the district court's conclusions concerning prejudgment interest and complementary damages). Because we conclude that the district court's jurisdictional holding must be reconsidered, we decline to address the parties' damages arguments.

**III**

The relative burdens of the parties with respect to establishing the applicability (or not) of an exception to sovereign immunity under the FSIA are well established, as is the applicable standard of review. "[T]he FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies, . . . and once shown, the sovereign bears the ultimate burden of persuasion to show the exception does not apply[.]" *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013); *see also Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 F. App'x 442, 449 (D.C. Cir. 2018). And when a district court considers the sovereign immunity question and rules that it has subject-matter jurisdiction over a legal claim brought in federal court against a foreign sovereign, that denial of immunity is reviewed de novo. *See Odhiambo*, 764 F.3d at 35.

**IV**

For the reasons explained below, we cannot accept the contentions that Iraq has implicitly waived its sovereign immunity or that the law of the case doctrine requires us to accept the Fourth Circuit's conclusions about the applicability of the second clause of the FSIA's commercial activities exception. And because we find that the second clause is only

applicable when the act inside the United States upon which the plaintiff's claim is based is an act *of the foreign sovereign*, we conclude that the district court's invocation of subject-matter jurisdiction over Wye Oak's claims against Iraq must be sustained, if at all, on the basis of another FSIA provision.

**A**

It is important to note, at the outset, that Wye Oak's argument that Iraq implicitly waived its immunity defense for the purpose of FSIA section 1605(a)(1)—the first immunity-related contention that Wye Oak makes on appeal—appears nowhere in the post-trial briefs that Wye Oak filed in the district court, and the trial judge did not address it. That omission alone raises the specter of forfeiture. *NetworkIP, LLC v. F.C.C.*, 548 F.3d 116, 120 (D.C. Cir. 2008) (explaining that arguments in favor of subject-matter jurisdiction can be forfeited by inattention or deliberate choice).

But even if we consider the merits of Wye Oak's implicit waiver assertion, Wye Oak does not explain how that argument—which is based upon Iraq's decision to participate in the DDC's bench trial and its failure to engage on the immunity issue in its trial briefs —squares with this court's holdings on the subject. Wye Oak cites *Phoenix Consulting, Inc v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000), which does admit the possibility that a foreign state's "failure to assert the immunity after consciously deciding to participate in the litigation may constitute an implied waiver of immunity," *id.* at 39. But, here, Iraq *did* "assert its immunity under the FSIA . . . in its responsive pleading." *Id.* Moreover, and importantly, we have never varied from the basic principle that "[a]n implied waiver depends upon the foreign government's having at some time *indicated* its amenability to suit." *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir.

1994) (emphasis added); *accord Creighton, Ltd.*, 181 F.3d at 122.

Far from demonstrating that it intended to waive sovereign immunity, Iraq squarely raised an immunity defense in a motion to dismiss that it timely filed at the first opportunity after Wye Oak filed the complaint, and it then vigorously litigated the EDVA's denial of that motion, including pursuing a separate appeal of that court's no-immunity ruling. To be sure, having lost that appeal, Iraq knowingly proceeded to litigate the claims against it, and ultimately responded to Wye Oak's post-trial jurisdictional arguments with a tepid statement about the court's needing to make its own decision about subject-matter and personal jurisdiction. But nothing in the record establishes that Iraq ever *disclaimed* or *withdrew* its long-preserved assertion of sovereign immunity. And, again, we have consistently concluded that what matters when discerning any type of waiver of sovereign immunity is the foreign sovereign's actual intent. *See Foremost-McKesson*, 905 F.2d at 444; *see also Phoenix Consulting Inc.*, 216 F.3d at 39 (explaining that "if the sovereign makes a conscious decision to take part in the litigation, then it must assert its immunity under the FSIA either before or in its responsive pleading" (internal quotation marks and citation omitted)).

Thus, we cannot conclude that Iraq's trial participation and post-trial argument, standing alone, "fit in th[e] selective company" of implied waiver cases, *Khochinsky v. Republic of Poland*, 1 F.4th 1, 9 (D.C. Cir. 2021), or otherwise indicates Iraq's intent to abandon the immunity that it has asserted from the outset of this case, such that the FSIA's section 1605(a)(1) applies.

18

**B**

We also disagree with both of Wye Oak's paired assertions that (1) the law of the case doctrine requires us to accept the Fourth Circuit's holding that the second clause of the FSIA's commercial activities exception applies to abrogate Iraq's sovereign immunity, and, in any event, (2) the Fourth Circuit's analysis of the applicability of the second clause of section 1605(a)(2) to Wye Oak's breach of contract claims is substantively correct.

**1**

The "[l]aw-of-the-case doctrine refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided . . . by that court or a higher one in earlier phases." *Crocker v. Piedmont Aviation*, Inc. 49 F.3d 735, 739 (D.C. Cir. 1995) (internal quotation marks omitted). Colloquially speaking, the doctrine ensures that "the same issue presented a second time in the same case in the same court should lead to the same result." *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) (internal quotation marks and citation omitted); *see also*, *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016).

The law of the case doctrine is a principle that guides courts in the exercise of their discretion, not a binding rule. Thus, rigid adherence to rulings made at an earlier stage of a case is not required under all circumstances, as other circuits have recognized. *See Murphy v. F.D.I.C.*, 208 F.3d 959, 966 (11th Cir. 2000); *see also Pepper v. United States*, 562 U.S. 476, 506 (2011) (explaining that the doctrine "directs a court's discretion, it does not limit the tribunal's power"). Furthermore, there are certain situations in which it is widely accepted that courts should not apply the doctrine to preclude reconsideration of a prior legal determination, even if the issue

was previously litigated in the context of that case. *See, e.g.*, *Crocker*, 49 F.3d at 740 (explaining that "an intervening change of law" will "support a departure from the previously established law of the case"); *see also Pepper*, 562 U.S. at 506–07 (authorizing setting aside the doctrine "if the court is 'convinced that [the prior decision] is clearly erroneous and would work a manifest injustice'" (internal citations omitted)).

That said, Wye Oak's argument that the Fourth Circuit's ruling qualifies as law of the case falters at the threshold, because under the circumstances presented here—and, in particular, the distinct procedural postures in which the immunity issue arises—this court and the Fourth Circuit panel are actually addressing *different* questions.

The Fourth Circuit's de novo review of the EDVA's ruling was a targeted assessment of the legal sufficiency of Wye Oak's complaint for the purpose of proceeding to discovery. *See Wye Oak Tech., Inc.*, 666 F.3d at 216 (concluding that Wye Oak presented sufficient facts to support a reasonable inference that its breach of contract claim is based upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere). At most, the panel held that the allegations in Wye Oak's complaint could plausibly support a finding that the second clause of the FSIA's commercial activity exception applies such that sovereign immunity did not preclude continued litigation of Wye Oak's claims. Neither party asked the district court or this court to revisit *that* determination.

Instead, the full course of litigation commenced, and when the trial court in the DDC undertook to address whether Iraq was immune from judgment nearly a decade later, in order to assess whether it had subject-matter jurisdiction to issue a post-trial order against that foreign state, the DDC engaged in a

fundamentally distinct legal analysis *and* had a different assortment of tools with which to make its determination. Specifically, at that stage of the proceedings, the district court had the benefit of a full adversarial hearing of the issues and a developed factual record, and its task was to determine whether any FSIA exception had been triggered such that Iraq's immunity from judgment was abrogated and a post-trial judgment could be issued against it, in light of the established facts of the case.

In other words, our consideration of the sovereign immunity question, which stems from our review of the DDC's post-trial judgment, plainly transcends the Fourth Circuit's threshold conclusions about the plausible boundaries of Wye Oak's pleading for law of the case purposes. *Cf. Sherley v. Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012) (explaining that the preliminary injunction exception to the law of the case arose because "[a]n appellate court in a later phase of the litigation with a fully developed record, full briefing and argument, and fully developed consideration of the issue [should] not bind itself to the time-pressured decision it made earlier on a less adequate record").

It is also quite significant that the core legal issue that we are purportedly constrained to consider based on the Fourth Circuit's ruling itself pertains to the defense of immunity, and therefore the court's own subject-matter jurisdiction. Applying the law of the case doctrine to constrain a court's post-trial assessment of its own jurisdiction based on an earlier determination of that question is inherently incompatible with the established ongoing duty of a court to determine its own jurisdiction at every stage of the legal proceedings. *Cf. Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 95 (1998) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the

lower courts in a cause under review[.]" (internal quotation marks and citation omitted)); *see also Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."). Applying the law of the case doctrine to constrain subsequent jurisdictional analyses is also in tension with the federal rules that make clear that alleged jurisdictional defects are not waivable, *see* Fed. R. Civ. P. 12(h)(1), and can be raised "at any time[,]" Fed. R. Civ. P. 12(h)(3); *see also Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 81 (2009) (explaining that arguments *against* subject-matter jurisdiction can never be forfeited or waived).

Thus, it is hard to accept the suggestion that the law of the case doctrine must be rigidly applied to calcify a threshold determination that a court has subject-matter jurisdiction. *Cf. Bishop v. Smith*, 760 F.3d 1070, 1085 (10th Cir. 2014) (explaining that, while jurisdictional issues are not excluded from the law of the case doctrine, issues such as subject-matter jurisdiction may be particularly suitable for reconsideration, even where the law of the case doctrine might otherwise counsel against it). At the very least, there is considerable support for the notion that, when the issue on review is jurisdictional in nature, a doctrine that already incorporates a degree of discretion and flexibility should give way as needed to facilitate consideration of similar jurisdictional questions that may arise at subsequent (but procedurally distinct) stages of this case. *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) ("Law of the case, which is itself a malleable doctrine meant to balance the interests of correctness and finality, can likewise be *calibrated* to reflect

the increased priority placed on subject matter jurisdictional issues generally[.]" (emphasis added)).

*Sherley v. Sebelius*, does not hold otherwise. 689 F.3d at 776. Wye Oak points to that opinion and argues that, where the relevant facts are the same at both the pleading and the trial stages of the proceedings, the posture of the case should not matter. *See* Tr. of Oral Arg. 27–28. But this court in *Sherley* adhered to the earlier preliminary injunction ruling in that case primarily due to the earlier court's fulsome consideration of the legal issues based upon an already fully developed factual record. 689 F.3d at 782. Not so here. Again, the Fourth Circuit made its immunity determination in the context of a motion to dismiss that tested the sufficiency of Wye Oak's pleading, which is substantively different than accelerated consideration of the merits of a plaintiff's claims under the preliminary injunction standard.

In addition, as noted above, the scant and unproven factual allegations in Wye Oak's complaint were no match for the trial record; the latter included extensive evidence that both sides had presented about Iraq's commercial activity, Wye Oak's various acts of performance, and Iraq's alleged breach of the parties' agreement. Thus, when it came time for the final analysis of whether there was subject-matter jurisdiction to enter a post-trial judgment against this foreign state under the FSIA framework, the DDC's assessment was a far more significant undertaking than the threshold inquiry into whether the complaint's allegations provide a sufficient basis for the parties to proceed to litigate despite Iraq's immunity defense. And the latter is all that the Fourth Circuit addressed.

Therefore, we hold that we are not here being presented with "the same issue" that the Fourth Circuit decided in a

manner that implicates the law of the case doctrine. *Kimberlin*, 199 F.3d at 500.[1]

**2**

The district court below not only determined that law of the case required it to find that the second clause of the FSIA's commercial activities exception was satisfied, it also found affirmatively that the Fourth Circuit's immunity conclusions were correct, given the actions that Wye Oak took in the United States to perform under the BSA. *Wye Oak Tech.*, 2019 WL 4044046, at *23-*25. Wye Oak has reiterated that same substantive argument on appeal. *See* Appellee's Br. 25. And it is one that we reject for the following reasons.

To start, we note that the district court's factual findings concerning Wye Oak's conduct are reviewed for clear error. *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1207 (D.C. Cir. 2004). We consider de novo the district court's interpretation and application of 28 U.S.C. § 1605(a)(2). *Odhiambo*, 764 F.3d at 35.

There is no error, much less clear error, with respect to the district court's determination that "Wye Oak performed work

---

[1] In their briefs, the parties spill a considerable amount of ink debating whether, assuming the law of the case doctrine is applicable, one or more of the established exceptions to that doctrine applies. One such exception is where the previous decision was "clearly erroneous and would work a manifest injustice." *Crocker*, 49 F.3d at 740. We note here that our disagreement with the Fourth Circuit's substantive determination about the applicability of the second prong of the FSIA's commercial activity exception as a matter of law—which is detailed in Part 2 of this section—makes it quite likely that, even if the law of the case doctrine were applicable to the instant circumstances, the "clearly erroneous" exception to the doctrine would relieve us of the constraints that the doctrine imposes.

in the United States" in connection with the BSA such as "writing a computer program[,]" "maintaining e-mail communications[,]" and performing "administrative activities." *Wye Oak Tech.*, 2019 WL 4044046, at *24. However, that court's legal analysis is mistaken, because the second clause of the FSIA—which provides that foreign states are not immune when the legal action is "based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere," § 1605(a)(2)—requires that the act at issue be one that *the foreign state* has performed in the United States in connection with its commercial activity elsewhere.

The first clue that this is the correct interpretation of the commercial activities exception's second clause is the language and structure of that provision, taken as a whole. Section 1605(a)(2) is commonly considered with reference to its isolated clauses, but all three appear in a single subsection. *See* 28 U.S.C. § 1605(a)(2). And the first and third clauses have long been interpreted to relate only to the conduct of the foreign state—i.e., it is the foreign state that has to have engaged in activity that took place in the United States, or that has to have engaged in acts elsewhere that have an effect inside the United States. *See Odhiambo*, 764 F.3d at 36 (explaining that under clause one of the commercial activities exception, the plaintiff's claim must be "based upon some commercial activity by" the foreign state); *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, 600 F.3d 661, 662 (D.C. Cir. 2010) ("[F]oreign governments engaging in commercial activities outside the United States enjoy immunity from suit in U.S. courts unless those activities have a direct effect in the United States."); *see also Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 112 (2d Cir. 2016) (explaining that the "focus" of the direct effects clause of the commercial activities exception is "the activity of the

sovereign" and if such activity has a direct effect in the United States).

Consistent with the purposes of section 1605(a)(2), this court has previously determined that if the foreign state carries on commercial activity inside the United States (clause one), or if it engages in an act elsewhere in connection with its commercial activity elsewhere and that act has a direct effect inside the United States (clause three), there is no immunity for legal actions based upon that foreign state's domestic commercial activity or its impactful foreign act. *See*, *e.g.*, *Odhiambo*, 764 F.3d at 36–38. And our careful and considered application of the first and third clauses to link abrogation of sovereign immunity to the fact and implications of the foreign state's *own* activities renders it entirely anomalous for us to now read clause two to dispense with immunity if just *anyone* performs an act in the United States in connection with the foreign state's commercial activity.

The view that the second clause of the commercial activities exception is triggered only by acts of the foreign state is not an unusual position. Indeed, an established treatise that Wye Oak relies on specifically states that "the [commercial activities] exception's second clause provides for jurisdiction where *a defendant qualifying as a 'foreign state' under the statute engages in acts in the United States* in connection with a commercial activity abroad." Ernesto J. Sanchez, *The Foreign Sovereign Immunities Act Deskbook* 137 (2013) (emphasis added). So, too, have this court and others routinely focused on whether the defendant (the foreign state) has performed acts inside the United States in connection with its commercial activity elsewhere when undertaking the second-clause commercial activities exception inquiry. *See*, *e.g.*, *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 157 (2d Cir. 2007) (holding that the appellant's claims did not fall under the

second clause of the commercial activities exceptions because it failed to allege any acts performed by the foreign defendant in the United States as the basis of its complaint); *Can-Am Int'l, LLC v. Republic of Trinidad & Tobago*, 169 F. App'x 396, 406 (5th Cir. 2006) (stating that the acts of a foreign sovereign in the United States in connection with foreign commercial activity may give rise to subject-matter jurisdiction); *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1027 (D.C. Cir. 1982), *abrogated on other grounds by Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), (concluding the court had jurisdiction under the second clause of the commercial activities exception because Ireland performed an act in the United States by enticing Gilson to enter into a commercial contract); *see also Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*, 421 F. Supp. 2d 87 (D.D.C. 2006), *judgment aff'd*, 487 F.3d 928 (D.C. Cir. 2007) (finding no jurisdiction over a breach of contract claim because no element of the claim was based on any of the foreign defendant's commercial activities in United States).

To the extent that one might think that the second clause is ambiguous with respect to whose act counts because it lacks a qualifier that expressly links the referenced "act" to "the foreign state," the legislative history of section 1605(a)(2) leaves no doubt. Prior to the passage of the FSIA, the House Judiciary Committee produced a house report that analyzed each proposed section of the FSIA and explained the situations in which a foreign state would not be immune. *See* H.R. Rep. No. 94-1487, at 18–19 (1976). Significantly for present purposes, the Committee stated plainly that the second clause of the commercial activities exception "*looks to conduct of the foreign state in the United States.*" *Id.* at 19 (emphasis added). And the Senate Judiciary Committee echoed that exact same sentiment. *See* S. Rep. No. 94-1310, at 12 (1976) (stating that the "act performed in the United States in connection with a

commercial activity of the foreign state elsewhere, looks to conduct of the foreign state in the United States[.]”).

For all these reasons, we disagree with the view of the district court (and, for that matter, the Fourth Circuit) that the second clause of the commercial activities exception can be satisfied for FSIA purposes based on the various acts that *the plaintiff* (Wye Oak) took inside the United States to perform under the BSA. Again, we have no quarrel with the district court's finding that, while inside the United States, Wye Oak “wr[ote] a computer program that could ultimately be used to inventory and track all the equipment Wye Oak refurbish[ed]” pursuant to the BSA, and that it also handled electronic communications about the performance of the company's contractual obligations “to ensure Wye Oak's leadership was aware of all messages they received.” *Wye Oak Tech.*, 2019 WL 4044046, at *24. We only hold that, regardless, the necessary “act performed” that implicates the second clause of section 1605(a)(2) is an act of the foreign sovereign; therefore, the district court's application of that provision to support its jurisdiction based on Wye Oak's actions cannot be sustained.[2]

---

[2] The “based upon” language that appears in section 1605(a)(2) relates to all three clauses of that section, and it is, incidentally, yet another reason why Wye Oak's clause two argument fails. The Supreme Court has made clear that, to determine what an action is “based upon” for FSIA purposes, the court must “zero[] in on the core of the . . . suit” and assess whether “the particular conduct constitutes the gravamen of the suit.” *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015). And while neither the district court nor the Fourth Circuit discussed this responsibility, it is reasonably obvious that the gravamen of the Wye Oak's breach of contract suit is not any act of performance that Wye Oak undertook pursuant to the BSA. Rather, it is Iraq's nonperformance of its promised obligations, including its failure to pay for the services Wye Oak rendered, and that nonperformance occurred in Iraq, not in the United

28

## C

Our conclusion that the second clause of the FSIA's commercial activities exception is inapplicable does not mean that Iraq must be found to have retained its sovereign immunity with respect to Wye Oak's breach of contract claims—at least not yet—because Wye Oak points to one other potential basis for concluding that the district court has subject-matter jurisdiction to enter its post-trial judgment. The third clause of the commercial activities exception abrogates a foreign state's immunity if the legal action "is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). And there is no dispute that Wye Oak's lawsuit relates to Iraq's commercial activity and is based upon an act of Iraq that took place outside United States' territory: its failure to pay the invoices. Thus, the first two requirements for application of clause three of the FSIA's commercial activities exception are satisfied. *See Ivanenko v. Yanukovich*, 995 F.3d 232, 238 (D.C. Cir. 2021).

Wye Oak now maintains that the trial record also established the only other requirement for finding that clause

---

States. *See Zedan*, 849 F.2d at 1514 (explaining that the plaintiff's suit was not based "upon an act performed in the United States," but upon a contract entered into in Saudi Arabia, which was breached); *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 207 (2d Cir. 2018) (holding in a breach-of-contract case that the plaintiff's "lawsuit [was] 'based on' Argentina's breach of a commercial obligation"); *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1223 (11th Cir. 2018) (determining that "[t]he conduct that actually injured [plaintiff]—and therefore that makes up the gravamen of [his] lawsuit—is Venezuela's failure to return [certain artwork] to [him]" in breach of a bailment agreement).

three of the commercial activities exception applies, because Iraq's nonpayment had direct effects inside the United States. And from what we have seen so far, given the law in this area, we find that Wye Oak's clause-three argument is at least plausible. *See Weltover*, 504 U.S. at 607*; see also EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345 (D.C. Cir. 2018).

In particular, as examples of direct effects in the United States that flowed directly from the breach, Wye Oak points to the fact that Iraq was required to submit payment for Wye Oak's services to a bank in the United States, and that Iraq's nonpayment resulted in the cut-off of a flow of capital and personnel between the United States and Iraq. Wye Oak also argues that Iraq specifically targeted it (a Pennsylvania company) to engage in these services because Iraq knew that, when the bill was not paid, that loss of revenue would be felt in the United States. More generally, Wye Oak further maintains that Iraq's failure to make good on its payment obligations directly affected military and diplomatic operations in the United States.

These factual contentions are not uncontested; indeed, Iraq vigorously rejects Wye Oak's allegations in this regard. More importantly, however, Iraq asserts that the DDC did not make the "factual findings necessary for this [c]ourt to rule that any of Wye Oak's claimed consequences satisfy clause three, nor could it have on the record presented." Appellants' Reply Br. 14. And we also observe that there is no indication in the record that the district court specifically considered the disputed factual allegations about the impact of Iraq's failure to pay or any other facts that allegedly support application of the third clause of the commercial activities exception.

"Factfinding is the basic responsibility of district courts,

rather than appellate courts," *Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982) (internal quotations and citation omitted), and in this regard, we are fully cognizant of our limitations, *see id.* ("[T]he Court of Appeals should not . . . resolve[ ] in the first instance [a] factual dispute which had not been considered by the District Court."). The district court is in a much better position than we are to analyze Wye Oak's direct effects arguments in the first instance, and to engage in additional fact-finding, as may be necessary, if the existing record is unclear. Therefore, the current judgment will be vacated, and we are remanding this matter back to the district court for this purpose.

## V

For the reasons explained above, we cannot accept Wye Oak's argument that Iraq waived its sovereign immunity, nor do we agree with the Fourth Circuit's conclusion that the second clause of the FSIA's commercial activities exception applies based on the various activities that Wye Oak carried out in the United States in connection with its contract with Iraq. As for Wye Oak's alternative argument that the district court had subject-matter jurisdiction over its breach of contract claims because the third clause of the commercial activities exception applies to the facts established during the bench trial, we remand to the district court to make that assessment in the first instance.[3]

*So ordered.*

---

[3] We do not opine on the sufficiency of the existing record to support a determination that the district court has jurisdiction to enter the judgment here on the basis of clause three of the commercial activities exception, nor do we comment on the need to further develop the record to permit the district court to assess its own jurisdiction.